IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| EDWARD DEAN ARMSTRONG, JR., *et al.* | ) | |
| | ) | |
| v. | ) | No. 2:07-CV-104 |
| | ) | CONSOLIDATED |
| UNITED STATES FIRE INSURANCE | ) | |
| COMPANY, *et al.* | ) | |
| | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES FIRE INSURANCE | ) | |
| COMPANY, *et al.* | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 2:08-CV-55 |
| | ) | |
| WORLD TRUCKING, INC., *et al.* | ) | |

**MEMORANDUM OPINION**

In these judgment declaratory actions, all parties have moved for summary judgment or judgment as a matter of law. Currently pending before the Court is the motion of Edward D. Armstrong, Jr., et al. (the "Armstrong plaintiffs) for summary judgment, [Doc. 177], the motion for summary judgment filed by William and Karen Harmon, (the "Harmon plaintiffs") [Doc. 179], the motion for summary judgment filed by Valerie Carlson, ("Carlson"), [Doc. 181], North River Insurance Company's ("North River") motion for judgment as a matter of law, [Doc. 183], the motion for judgment as a matter of law filed by United States Fire Insurance Company ("U.S. Fire"), [Doc.185], and the motion of XTRA, Inc. and XTRA Lease, LLC (jointly referred to as "XTRA") for summary judgment. [Doc.84]. Responses and replies have been filed, and the Court heard oral

argument on the motions on February 17, 2009. The motions are now ripe for disposition.[1] For the reasons which follow, the Carlson, Harmon plaintiffs' and Armstrong plaintiffs' motions will be denied and the motions of North River, U.S. Fire and XTRA will be granted.

## I. Factual and Procedural Background

On March 7, 2004, Nasko Nazov ("Nazov") was operating a tractor-trailer rig northbound on Interstate 81 in Greene County, Tennessee when he drove, apparently at a high rate of speed, into the rear of vehicles which were stopped as the result of an unrelated traffic accident. As a result of the collision, Edward Dean Armstrong, III, his wife, Melissa Carlson Armstrong, and his two minor children, Brittany Nicole Armstrong and Edward Dean Armstrong, IV, occupants of one of the automobiles, were killed. Also struck was an automobile driven by William Harmon and occupied by his wife, Karen Harmon, who suffered serious personal injury as a result of the collision.

At the time of the accident, Nazov was an employee of World Trucking Inc. and/or World Trucking Express, Inc. (jointly referred to as "World Trucking"), which was the lessee of the tractor-trailer. Marjan Milev ("Milev") owned the tractor involved in the collision and XTRA was the owner and lessor of the trailer involved in the collision.[2] Dobrin Zahariev Dobrikov and Stanislava Z. Dobrikov are the owners of World Trucking.

---

[1]  The defendants have filed a motion to dismiss the motions for summary judgment without prejudice or alternatively, to abate the motions, [Doc. 224], arguing, as they have in other pleadings, that a judgment must be entered in the tort cases in favor of plaintiffs before these motions are ripe for disposition. They now suggest that the tort action should proceed to judgment before a resolution of this case. They make the argument despite having orally represented to this Court that the declaratory judgment action should be resolved and the personal injury actions stayed and despite the fact that they have admitted, for the purpose of this case, facts alleged in the tort action which clearly entitle plaintiffs to a judgment in their favor in those cases.

[2]  It appears that the trailer was actually leased by XTRA Lease,LLC; however, for the purposes of the motions before the Court, this fact is irrelevant.

Thereafter, three separate diversity lawsuits were filed in this Court: *Valerie Carlson* [3] *v. World Trucking, Inc., Nasko Nazov and Marjan Milev*, No. 2:05-CV-44; *Edward Dean Armstrong, Jr., Kathy Lynn Chesney* [4]*, and Susan Kay Smith Armstrong v. World Trucking, Inc., World Trucking Express*, Inc, *Nasko Nazov, Marjan Milev*, *Dobrin Zahariev Dobrikov and Stanislava Z. Dobrikov*, No. 2:05-CV-62; and *William Harmon and Karen Harmon v. World Trucking, Inc., World Trucking Express, Inc, Nasko Nazov, Marjan Milev*, *Dobrin Zahariev Dobrikov and Stanislava Z. Dobrikov*, No. 2:05-CV-65. XTRA, the owner and lessor of the trailer involved in the collision, is not a defendant in any of these lawsuits.[5]

Collectively, these lawsuits will be referred to as the "tort cases." The tort cases were reported settled [6]; however, the plaintiffs have refused to complete those settlements and dismiss the tort cases because, they allege, they discovered the insurance policy which is the subject of this lawsuit after entering into those settlement agreements. The tort cases, therefore, remain pending, although they have been stayed pending resolution of these declaratory judgment actions.

On March 9, 2007, U.S. Fire and North River filed a declaratory judgment action in the United States District Court for the District of New Jersey which named as defendants World

---

[3]    Valerie Carlson is the mother and next of kin of Melissa Carlson Armstrong, deceased, and the administrator of her estate.

[4]    Edward Dean Armstrong, Jr. and Kathy Lynn Chesney are the sole survivors, parents and next of kin of Edward Dean Armstrong, III, deceased, and Susan Kay Smith Armstrong  is the sole survivor, mother and next of kin of Brittany Nicole Armstrong and Edward Dean Armstrong, IV, deceased.

[5]    At oral argument on these motions, the Armstrong plaintiffs' attorney admitted that they had no good faith basis for naming XTRA as a defendant.

[6]    Based on documents filed in the tort cases, all plaintiffs in the tort cases agreed to a total settlement of $1,000,000.00 with World Trucking, the policy limits of the applicable liability insurance coverage carried by World Trucking.  The plaintiffs agreed to an equal division of the liability insurance proceeds.  In addition, the Armstrong plaintiffs have available additional uninsured motorist benefits of $400,000.00. [See Docs. 66, 67 in case No.  2:05-CV-44].

Trucking, Inc., World Trucking Express, Inc. and XTRA Corporation. The subject of the New Jersey declaratory judgment action is a liability policy issued by U.S. Fire to XTRA Corporation and an umbrella liability policy issued by North River to XTRA Corporation. U.S. Fire sought a declaration from that court that U.S. Fire has no duty to defend or indemnify World Trucking, Inc. and/or World Trucking Express, Inc. for the claims in the tort cases filed in this Court and for a declaration that World Trucking, Inc. and World Trucking Express, Inc. are not additional insureds under the U.S. Fire policy. North River seeks a declaration from the Court that North River has no duty to indemnify World Trucking, Inc. and/or World Trucking Express, Inc. for the claims made by the plaintiffs in the underlying tort cases and a declaration that World Trucking, Inc. and World Trucking Express, Inc. are not additional insurers under the North River policy.

On May 9, 2007, the Armstrong plaintiffs filed a complaint for declaratory judgment in this Court against U.S. Fire, North River, Nazov, Milev, World Trucking, the Dobrikovs, XTRA, Carlson and the Harmon plaintiffs. The declaratory judgment action filed in this Court involves the same policies issued by U.S. Fire and North River to XTRA which are referenced in the New Jersey declaratory judgment action. The Armstrong plaintiffs seek a declaration of the Court that U.S. Fire and North River have a duty to indemnify the defendants in the tort cases for the use and benefit of the plaintiffs in those tort cases and that Nazov, Milev, World Trucking, Inc. and World Trucking Express, Inc. are additional insureds under the insurance policies issued by U.S. Fire and North River.

On February 13, 2008, the United States District Court for the District of New Jersey *sua sponte* transferred venue of the New Jersey action to this Court, where it was consolidated with the action filed by the Armstrong plaintiffs.

## II. The Insurance Policies at Issue

## A. The U. S. Fire Policy

Policy # 1380265299 was issued by U.S. Fire to XTRA Corporation[7] for the policy period from December 1, 2003, to October 1, 2004. The policy provides Commercial Auto (Business or Truckers) Coverage with liability limits of $1,000,000.00 for any one accident or loss. The policy provides liability coverage and obligates U.S. Fire to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'".

U.S. Fire Policy, Sec. II, A.

The policy contains the following provisions relevant to the issues in this case:

> I.. **Who is an Insured**
> The following are "insureds":
>
> a. You for any covered "auto".
>
> b. Anyone else while using with your permission a covered "auto"
> you own, hire or borrow . . .[8]

*Id.,* Sec. II, A, 1.

> "Insured" means any person or organization qualifying as an insured
> in the Who Is An Insured provision of the applicable coverage . . . .

*Id.*, Sec. V, G.

> "Auto'" means a land motor vehicle, "trailer" or semi-trailer designed
> for travel on public roads but does not include "mobile equipment".

---

[7]  XTRA Corporation is the same entity as XTRA, Inc. The policy contains a "named insured endorsement" which lists a number of entities as additional insureds on the policy, including XTRA Leasing, Inc., the entity which apparently owned the trailer involved in the collision on March 7, 2004.

[8]  This clause of the policy contains five exceptions which are not suggested by any party to have any application to this case.

*Id.*, Sec. V, B.

> "Trailer" includes semitrailer.

*Id.*, Sec. V, P.

> 5. Other Insurance
>
> > a. For any covered "autos" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance. However, while a covered "auto" which is a "trailer" is connected to another vehicle, the Liability Coverage this Coverage Form provides for the "trailer" is:
>
> (1) Excess while it is connected to a motor vehicle you do not own.
>
> (2) Primary while it is connected to a covered "auto" you own.

*Id.*, Sec. IV, 5, a.

The U.S. Fire policy contains two endorsements which are relevant to this case. The policy contains an "Endorsement No. CO-013 which provides: "IT IS AGREED THAT THE LESSEES OF VEHICLES, LEASED TO THEM BY THE NAMED INSURED, ARE NOT AN INSURED UNDER THIS POLICY." The policy also contains an "ENDORSEMENT FOR MOTOR CARRIER POLICIES OF INSURANCE FOR PUBLIC LIABILITY UNDER SECTIONS 29 AND 30 OF THE MOTOR CARRIER ACT OF 1980," commonly known as an MCS-90 endorsement. The MCS-90 endorsement reads as follows:

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration (FHWA) and the Interstate Commerce Commission (ICC).
>
> In consideration of the premium stated in the policy to which this

endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or for the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately, to each accident, and any payment under the policy because of any one accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

7

**B.   The North River Policy**

North River issued policy # 553-085033-4 to XTRA for the policy period from October 1, 2003, to October 1, 2004.  The policy is a Commercial Umbrella Policy with limits of liability for each occurrence, and in the aggregate, of $15,000,000.00.  The North River policy identifies the U.S. Fire policy as "underlying" automobile liability insurance and contains an "Automobile Limitation" endorsement which provides:

> With respect to "Bodily Injury" or "Property Damage" arising out of the ownership, maintenance, operation, use, loading or unloading of any "Automobile", this policy is limited to the coverage provided to you in the "Underlying Insurance".
>
> If coverage is not provided by such policies, coverage is excluded from this policy.

The North River policy's insuring agreement provides liability coverage on behalf of the "Insured" for sums which the "Insured" is "legally obligated to pay as damages" for "Bodily Injury" or "Property Damage" occurring during the policy period and caused by an "Occurrence".  North River policy, Sec. I, A.  The term "Insured" includes the "Named Insured" (XTRA) and "any person who has [XTRA'S] permission to use an 'Automobile' owned by [XTRA], loaned to [XTRA], or hired for use by [XTRA], and any person or organization legally responsible for the use of that 'Automobile'"; . . .  *Id.*, Sec. III, B, 1 and C, 3.  "Automobile" is defined as "a land motor vehicle, trailer or semitrailer designed for travel on public roads, . . ." *Id.*, Sec. IV.  "Occurrence" includes an automobile accident.  *Id.*

The North River policy does not contain a provision similar to that contained in endorsement CO-013 in the U.S. Fire policy; however, it does contain the "Automobile Limitation" set forth above,  thus incorporating the exclusion of endorsement CO-013 to the extent it limits coverage

under the U.S. Fire policy. The North River policy does not explicitly contain a form MCS-90 endorsement.

### III. Standard of Review

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McClain v. Ontario, Ltd.*, 244 F.3d 797, 800 (6th Cir. 2000). This Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If this Court concludes that a fair-minded jury could

not return a verdict in favor of the non-moving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The party opposing a Rule 56 motion may not simply rest on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. Instead, an opposing party must affirmatively present competent evidence sufficient to establish a genuine issue of material fact necessitating the trial of that issue. *Id.* Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.* A genuine issue for trial is not established by evidence that is "merely colorable," or by factual disputes that are irrelevant or unnecessary. *Id.* at 248-52.[9]

Judgment as a matter of law is appropriate where, after a party has been fully heard on an issue, "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). In making this determination, the court must view the evidence in the light most favorable to the nonmovant. *Diamond v. Howd,* 288 F.3d 932, 935 (6th Cir. 2002). **IV. Choice of Law**

Jurisdiction in these cases is invoked under 28 U.S.C. § 1331, with all parties seeking a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* The parties agree that the Court must apply state law on questions of policy interpretation and scope of coverage of the policies at issue, and they agree that the Court must apply the choice of law of the state in which it sits. See *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941) *; Eric R.R. Co.*

---

[9] There are no genuine factual disputes in this case, as the parties agree on the relevant underlying facts. The issue for the Court is a legal one, making the case appropriate for disposition by summary judgment or judgment as a matter of law.

*v. Tompkins*, 304 U.S. 64 (1938). Under Tennessee law, the substantive rights of parties to an insurance contract are governed by the laws of the state contemplated by the parties. Absent an enforceable choice of law clause in the policy, the parties are presumed to have intended to apply the laws of the state in which the contract was entered into. *Standard Fire Ins. Co. v. Chester-O'Donley & Assoc.*, 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998). Consequently, with respect to insurance contracts without enforceable choice of law clauses, Tennessee courts apply the substantive law of the state where the policy was issued and delivered. *Id.*

The tort plaintiffs, in their briefs in support of their motion, appear to assume, without discussion, that it is Tennessee's substantive law which applies to these cases. U.S. Fire and North River, on the other hand, argue that both policies "were issued to XTRA Corporation at 200 Nyala Farms Road, Westport, Connecticut," [Doc. 223, p. 4], and argue that Connecticut law applies to these cases. [10] At oral argument on the pending motions, counsel for the Armstrong plaintiffs suggested that it might be Missouri or New Jersey law which applies, because XTRA has offices in those states. In a supplemental filing, [Doc. 250], the Armstrong plaintiffs now assert that Arizona is the state of delivery of the policies at issue and that this Court should apply Arizona law on the issues governed by state law in these cases. In support of their position, the Armstrong plaintiffs have attached to their supplemental filing letters produced during discovery which purport to establish that the policies were delivered to XTRA in Phoenix, Arizona. [11]

---

[10] When questioned at oral argument about what proof in the record establishes that the policies were delivered to XTRA in Connecticut, counsel for U.S. Fire and North River directed the Court to the declaration pages of the U.S. Fire policies which list XTRA's mailing address as 200 Nyala Farms Road, Westport, CT. 06880.

[11] A review of the letters offered by the Armstrong plaintiffs is support of their argument that Arizona law should apply establishes, at best, only that the North River policy was delivered in Arizona. (Doc. 250-6). The February 9, 2004, letter dealing with the U.S. Fire policy establishes only that it was

The evidence in the record on the issue of where the policies at issue were delivered is scant and insufficiently developed to establish clearly the state of delivery of the policies. For reasons more fully discussed below, however, it is unnecessary for the Court to decide which state's law to apply because there is no real difference in the relevant laws of the states involved and application of the laws of either Tennessee, Connecticut or Arizona would produce the same result. A court need not make a choice of law if, in fact, there is not a real difference or conflict between the relevant laws of the states involved and should apply the forum state's law if it is not in conflict with that of other jurisdiction involved. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985). In fact, a conflict between the laws of the states at issue is a necessary predicate to deciding which state's laws should govern the issues presented in the case. *Hataway v. McKinley*, 830 S.W.2d 53, 57 (Tenn. 1992). Because the result is the same on the issues governed by state law in these cases, regardless of whether the Court applies Tennessee, Connecticut or Arizona law, the Court will apply Tennessee law.

The parties agree that state law does not apply on one issue in the case. Federal law applies to the operation and effect of the MCS-90. *John Deere Ins. Co. v. Nueva*, 229 F.3d 853 (9th Cir. 2000) (citing *Planet Ins. Co. v. Transport Indemnity Co.*, 823 F.2d 285, 288 (9th Cir. 1987)); *Canal Ins. Co. v. First General Ins. Co.*, 889 F.2d 604, 610 (5th Cir. 1989), *modified on other grounds* 901 F.2d 45 (5th Cir. 1980); *see also Carolina Cas. Inc. Co. v. E.C. Trucking*, 396 F.3d 837 (7th Cir. 2005). Although it does not appear that the Sixth Circuit has addressed this precise question, no reason exists why the Sixth Circuit would not follow the established rule from other circuits. *See, e.g., Kline v. Gulf Ins. Co.*, 466 F.3d 450, 453 fn. 5 (6th Cir. 2006), (citing cases from the Third and

---

mailed to XTRA's insurance agent in Needham, Massachusetts. (Doc. 250-5).

Fifth Circuits for the general rule that "an MCS-90 is to be interpreted under federal law" and suggesting that the Sixth Circuit would follow the rule, at least in cases where the MCS-90 is incorporated into the policy for purposes of "compliance with federal regulations" – *i.e.* required by the Motor Carrier Act.)

## V. Pending Motions

For purposes of clarity, the Armstrong, Harmon and Carlson plaintiffs in the tort actions will be referred to in the following analysis as "plaintiffs", and U.S. Fire, North River and XTRA will be referred to as "defendants," unless the context indicates otherwise.

### A. Plaintiffs' Motions For Summary Judgment

Plaintiffs argue that the U.S. Fire policy provides coverage to Nazov, Milev, and World Trucking as permissive users of the trailer leased from XTRA, notwithstanding endorsement CO-013, which excludes from coverage lessees of vehicles, and without reference to what plaintiffs see as the "broadening provisions" of the MCS-90. According to plaintiffs, the trailer owned by XTRA is a covered auto which was contractually in the possession of World Trucking, thus making the operator and driver of the trailer permissive users under the terms and conditions of the policy and establishing coverage. Plaintiffs argue that the endorsement CO-013, which provides "that the lessees of vehicles, leased to them by the named insured, are not insureds under this policy," does not operate to limit permissive user coverage because "vehicle" is not defined in the policy and is ambiguous. Because the term is a technical one which cannot be given its "plain, ordinary and popular" meaning, its meaning is uncertain and should be "construed against the insurance company and in favor of the insured." Plaintiffs also argue that the endorsement Co-013 is against public policy.

Alternatively, plaintiffs maintain that the MCS-90 endorsement operates to negate the CO-013 endorsement because the CO-013 endorsement "constitutes a condition or limitation that attempts to alter the underlying policy and relieve U.S. Fire from liability." [Doc. 178, p. 18]. Plaintiffs rely primarily on decisions of the Ohio and Virginia Supreme Courts in *Lynch v. Yob*, 768 N.E.2d 1158 (Ohio 2002) and *Heron v. Transportation Cas. Ins. Co.*, 650 S.E.2d 699 (Va. 2007) and decisions of the Ninth and Tenth Circuits in *John Deere Ins. Co. v, Nueva*, 229 F.3d 853 (9th Cir. 2000), *cert. denied,* 534 U.S. 1127 (2002) and *Adams v. Royal Indem. Co.*, 99 F.3d 964 (10th Cir. 1996) as authority for the proposition that the MCS-90 eliminates any limiting clauses in the underlying policy, such as the CO-013 endorsement, which restrict the scope of coverage. Any other interpretation of the MCS-90 would frustrate the purpose of the MCS-90, according to the plaintiffs. Furthermore, plaintiffs argue, the MCS-90 endorsement is triggered to provide coverage despite the fact that the injured parties have available to them other insurance coverage in excess of the statutory financial responsibility limit, citing *Carolina Cas. Ins. Co. v. Yeates*, 533 F.3d 1202 (10th Cir. 2008), *reh'g en banc* granted, 545 F3d 915 (10th Cir. 2008); *Green v. Royal Indem. Co.*, 1994 WL 267749 (S.D.N.Y. 1994), *Hamm v, Canal Ins. Co.*, 10 F. Supp. 2d 539 (M.D.N.C. 1998) and *Kline v. Gulf Ins. Co.*, 466 F.3d 450 (6th Cir. 2006).

As for the North River policy, plaintiffs argue that it is a "following form" policy which provides coverage for any loss covered under the U.S. Fire policy. Because World Trucking, Nazov and Milev are insureds under the U.S. Fire policy, they are also insureds under the North River policy.

**B.  U.S. Fire's Motion For Summary Judgment**

U.S. Fire argues initially that World Trucking, Nazov and Milev are not insureds under the

U.S. Fire policy because "[t]heir names do not appear on the declarations page, nor do they appear on the named insured endorsement page." [Doc. 186, p.7]   U.S. Fire also argues that the endorsement CO-013 expressly excludes lessees, such as World Trucking, from coverage under the policy.  U.S. Fire also maintains that, even if World Trucking, Nazov and Milev were insureds under the policy, they have not complied with certain conditions of coverage and are, therefore, not entitled to recover under the policy.

Secondly, U.S. Fire asserts that the MCS-90 endorsement attached to the U.S. Fire policy does not cover the lessee of a trailer, relying on *Del Real v. United States Fire Ins. Crum and Forster*, 64 F.Supp.2d 958 (E.D. Cal. 1998), *aff'd,* 188 F.3d 512 (9th Cir. 1999)(Table).  Based on *Del Real*, U.S. Fire argues that the lessee of the trailer and the driver of the tractor cannot be insureds under the U.S. Fire policy and U.S. Fire therefore has no obligation to indemnify any of the defendants in the underlying tort actions.   Additionally, U.S. Fire argues that the MCS-90 is inapplicable to XTRA because XTRA is not a for-hire motor carrier and the MCS-90 is only implicated when an insured is carrying goods for-hire and is therefore subject to the financial responsibility requirements of the Motor Carrier Act.[12]  Once again U.S. Fire relies on *Del Real* and also cites *Castro v. Budget Rent-A-Car System, Inc.*, 65 Cal. Rptr.3d 430, 164 Cal. App. 4th 1162, (Cal. Ct. App. 2007) and *Amerisure Mutual Ins. Co. v. Carey Transportation, Inc.*, 2007 WL 29235 (Mich. Ct. App. 2007).

---

[12]   Although XTRA and U.S. Fire argue that XTRA is not a for-hire carrier and have submitted an affidavit in support of its motion for summary judgment which states that "XTRA Lease is in the business of leasing trailers to motor carriers" and that "XTRA does not transport property for compensation," they never explain why the MCS-90 is attached to the policy, except for a passing reference that it has been attached because XTRA operates 123 "service trucks."  The Motor Carrier Act requires the MCS-90 for "for-hire motor carriers operating motor vehicles transporting property in interstate or foreign commerce."  49 C.F.R. § 387.1.  The Court need not decide whether XTRA is a for-hire carrier.

Lastly, U.S. Fire argues that the $1,000,000.00 insurance coverage carried by World Trucking satisfies the financial responsibility obligation of the federal regulations and thus the public policy considerations behind the federal regulations are satisfied. Because the for-hire carrier, World Trucking, "provides a level of compensation that meets the federal regulations," the public policy considerations behind the MSC-90 requirement do not justify "rewriting the policy." [Doc. 186, pp. 15-16].

### C. North River's Motion For Summary Judgment

North River makes and adopts the same arguments made by U.S. Fire and also asserts that North River could not, under any circumstances, provide coverage under its policy if the U.S. Fire policy provides no coverage. In addition, North River argues that, even if the U.S. Fire policy provides coverage, it does not necessarily follow that the North River policy does also, as plaintiffs argue. North River maintains that its policy is not a "follow form" policy, but rather that the North River policy "contains its own insuring agreement, conditions, definitions, exclusions, and endorsements." [Doc. 184, p. 8]. Thus, the North River policy must be analyzed according to its own terms, conditions and exclusions. North River argues that its policy has no MCS-90 endorsement nor any provision which would incorporate the MCS-90 from the U.S. Fire policy. Lastly, North River maintains that, even if its policy provides coverage, it has no duty to indemnify until the U.S. Fire coverage is exhausted.

### D. XTRA's Motion For Summary Judgment

XTRA largely repeats and expands upon the arguments made by U.S. Fire and North River. XTRA does make one argument, however, not addressed by U.S. Fire or North River. XTRA relies on Federal Motor Carrier Safety Administration ("FMCSA") "regulatory guidance" to support its argument that the MCS-90 does not extend coverage to permissive users such as World Trucking in this case. XTRA implicitly suggests that the agency guidance would likely change the result in *John Deere v. Nueva* and *Lynch v. Yob* and is controlling authority.

### VI. Analysis and Discussion

**A. Are World Trucking, Nazov and Milev "insureds" under the U.S. Fire basic policy, without regard to the endorsements?**

As an initial matter, the Court will address the question of whether World Trucking, Nazov and Milev are insureds under the U.S. Fire policy without consideration of either the CO-013 or MCS-90 endorsements. If the answer to this initial question is "no," then the Court's inquiry ends. No defendant, however, makes any serious or substantial argument that the tort defendants do not fall within the definition of insured in the policy.

The U.S. Fire policy provides that XTRA and "**anyone else**" who uses a covered auto with permission of XTRA is an insured under the policy. U.S. Fire policy, Sec. II, A, 1 (emphasis added). "Auto" is defined under the policy to specifically include "trailer" or "semitrailer." *Id.* Sec. IV, B. The policy clearly defines "covered auto" as any auto, including a trailer, owned by XTRA. *Id.* Sec. I.

No defendant disputes ownership of the trailer involved in the March 7, 2004, accident by XTRA. Nor does any party seriously dispute that the trailer was being operated on March 7 by

World Trucking with the permission of XTRA pursuant to the terms of their lease agreement.[13]

Thus, World Trucking, Nazov and, potentially, Milev were permissive users of a covered auto at the

time of the March 7 accident and clearly insureds under the terms of the basic U.S. Fire policy.

### B.   What is the effect of the endorsement CO-013 on the U.S. Fire policy?

The U.S. Fire policy includes endorsement CO-013 which reads as follows: "It is agreed that

the lessees of vehicles, leased to them by the named insured, are not an insured under this policy."

Endorsement CO-013 clearly operates to exclude from the definition of insured under the policy the

lessees of vehicles leased to them by XTRA.  At first blush, the endorsement would clearly seem

to operate to exclude the tort defendants, as lessees of the trailer, from the definition of an insured.

The policy, however, does not contain a definition of "vehicle" or "vehicles" and plaintiffs argue

that the term is ambiguous and lends itself to more than one meaning and should, thus, be construed

against the insurance company.

As noted above, the policy defines the term "auto" as "a land motor vehicle, 'trailer' or

'semitrailer' designed for travel on public roads but does not include 'mobile equipment.'"  "Mobile

equipment" is defined as various types of land vehicles, including bulldozers and other land vehicles

designed for off road use, vehicles on crawler treads, vehicles maintained primarily to provide

---

[13]   U.S. Fire and North River in their response to plaintiffs' motions for summary judgment, make the rather disingenuous argument that no proof has been offered that "Nazov or Milev were permissive users of the trailer.  There is nothing that shows that their identity was ever disclosed to XTRA prior to the accident." [Doc. 223, p.8].  It borders on sheer nonsense for these insurance companies to make the argument that World Trucking might be a permissive user but not World Trucking's driver employee.  In addition, they point to no legal authority or provision of the lease which would require a corporate lessee to disclose the identity of its driver or other person authorized by the lessee to use the trailer to the lessor.  The lease agreement appears only to require prior approval by the lessor in the event of a sub-lease or assignment of the agreement.  Milev, the owner of World Trucking, is potentially an insured under the terms of the policy because of the allegations in the underlying tort action of corporate irregularities which would allow plaintiffs to pierce the corporate veil.  In any event, it is not necessary for the Court to resolve the question of whether Milev somehow fits the definition of a permissive user under the policy.

mobility to permanently mounted cranes, shovels, loaders and the like, road graders, scrapers or rollers or other permanently attached equipment <u>and</u> other vehicles maintained primarily for purposes other than the transportation of persons or cargo. In view of these definitions, plaintiffs argue that "vehicles could mean mobile equipment since the term is used to describe examples of property excluded from coverage, or, perhaps the term was used in lieu of land motor vehicles– its meaning is uncertain." [Doc. 178, p. 12] (Internal quotation marks omitted).

An insurance policy is ambiguous if it is capable of more than one reasonable construction. *See Harkavy v. Phoenix Ins. Co.*, 417 S.W.2d 542, 546 (Tenn. 1967). Where policy language is ambiguous, Tennessee law requires that the language be construed in favor of the insured. *Id.* at 546; *Spears v. Commercial Ins. Co. of Newark, New Jersey*, 866 S.W.2d 544, 550 (Tenn. App. 1993). A provision in a policy limiting or reducing coverage is to be construed strongly against the insurance company. *Sturgill v. Life Ins. Co. of Georgia*, 465 S.W.2d 742, 745 (Tenn. App. 1970). Exclusions in insurance policies must be strongly construed against the insurance company and in favor of the insured. *See Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991); *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 367 (Tenn. 1973). These clauses should not, however, "be so narrowly construed as to defeat their evident purpose." *Tomlinson v. Bituminous Cas. Corp.,* 117 F.3d 1421, 1997 WL 397248 (6th Cir. 1997) (unpublished) (applying Tennessee law).

This Court finds no ambiguity in the word "vehicles." While the definitions, viewed together, suggest that the word "vehicles" has a broader meaning perhaps than the word "auto"[14] and that the term "auto" has a broader meaning than "trailer," it is clear that the word "vehicle" includes

---

[14] See, *e.g.* U.S. Fire policy, Sec. I, C, which suggests that only certain types of vehicles are insured in the definition of "autos."

both autos and trailers. Plaintiffs' efforts to create ambiguity is unconvincing. As a matter of common sense and ordinary usage, the word "vehicles" as used in endorsement CO-013 includes the trailer involved in the March 7 accident. The clear language of the endorsement compels the conclusion that the tort defendants, as lessees of the trailer at issue, are excluded by operation of the endorsement from the class of insureds under the policy.

Plaintiffs originally made a second argument with respect to the endorsement CO-013. Citing *Commercial Union Ins. Co. v. Universal Underwriters, Inc.*, 442 S.W.2d 614 (Tenn. 1969) and *McManus v. State Farm*, 463 S.W.2d 702 (Tenn. 1971), they argued that the endorsement is not permitted by Tennessee law and void because it violates the public policy of Tennessee. Plaintiffs have now apparently abandoned that argument and argue, instead, that Arizona law applies and the endorsement is void because it violates the public policy of Arizona.[15]   Defendants respond that neither the law of Tennessee nor the law of Arizona would invalidate the lessee exclusions in the U.S. Fire policy.

On this issue, the Court is constrained to agree with defendants. Even if Tennessee law applies to the interpretation of the lessee exclusions of the U.S. Fire policy, it clearly is not void. *Commerical Union* did, in fact, deal with the validity of a provision in a contract of insurance limiting coverage of permissive drivers. Based on Tennessee's then existing financial responsibility statutes, the supreme court held the provision void in view of the public policy expressed by the legislature in the Financial Responsibility Act. *Commercial Union*, 442 S.W.2d at 617. The almost

---

[15]   At oral argument, counsel for the Armstrong plaintiffs conceded that later decisions of the Tennessee courts have likely resolved this issue in defendants' favor. Defendants characterize plaintiffs' argument that Arizona law applies to this case as "a futile attempt to find a jurisdiction they hope will be sympathetic to their effort to invalidate the lessee exclusions in the U.S. Fire policy "and blatant forum shopping." While the Court does not so hold, plaintiffs' rapidly changing position certainly gives that appearance.

20

identical question was again considered by the Tennessee Supreme Court just two years later in *McManus*. Once again, the policy provision in question excluded coverage for a permissive user of the insured auto. The supreme court, however, held the provision "not void" and largely overruled *Commercial Union*. *McManus*, 463 S.W.2d at 705.

Any lingering question about the continued viability of *Commercial Union* on the question was resolved in *Purkey v. American Home Assurance Co.*, 173 S.W.3d 703 (Tenn. 2005). In a case dealing with certified questions of law from the northern division of this Court, the Tennessee Supreme Court addressed the question of whether provisions in an automobile liability insurance policy excluding coverage for bodily injury to household or family members of the insured were void as against Tennessee law or public policy as expressed in the financial responsibility law, Tennessee Code Annotated §§ 55-12-101 thru 140 (2004). The supreme court examined the interplay between Tennessee Code Annotated § 5-12-122, which requires that motor vehicle liability policies "shall insure the person named therein, and any other person using any such motor vehicle or motor vehicles with the express or implied permission of such named insured, against loss from the liability imposed by law for damages arising out of the ownership, maintenance or use of such motor vehicle..." and Tennessee Code Annotated § 56-7-121 (2000), which provides that "[n]otwithstanding and other provision of law to the contrary, an insurer may exclude coverage pursuant to a contractual agreement; . . ." Finding that Tennessee Code Annotated § 56-7-121 gives broad authority for exclusionary clauses in insurance policies, the court found this provision to "trump all others." The court held that "family or household exclusions in automobile liability insurance policies do not violate Tennessee law or public policy." *Id.* at 709. The court's reasoning in *Purkey* applies with equal force to the policy under consideration here.

Plaintiffs likewise misconstrue Arizona law in arguing that the lessee exclusion would be invalid under that state's statutory and case law. The plaintiffs cite "Section 28-1170(B)(2) of Arizona's version of the Uniform Motor Vehicle Safety Responsibility Act" as requiring liability insurance policies to cover any person "using the motor vehicle . . . with the express or implied permission of the named insured." Defendants respond that plaintiffs rely on a now repealed statute. Defendants are incorrect. Section 28-1170(B)(2) has not been repealed but has been recodified at ARS § 28-4009 and provides that an "owner's motor vehicle liability policy shall insure the person named in the policy as the insured and any other person, as insured, using that motor vehicle or vehicles with the express or implied permission of the named insured . . ." ARS § 28-4009(A)(2)(2009).

Plaintiffs also correctly state that the requirements of the section, commonly known as the "omnibus clause," is read by law into every motor vehicle liability policy in Arizona and overrides competing restrictive endorsements. *Principal Casualty Ins. Co. v. Progressive Casualty Ins. Co.*, 172 Ariz. 545, 838 P.2d 1306 (1992). That, however, does not compel a finding that the lessee exclusions in the U.S. Fire policy is void and against Arizona public policy.

One obvious reason is that the trailer owned by XTRA is not a "motor vehicle" as that term is defined in the Arizona Financial Responsibility Act. "Motor vehicle" is defined as "a self-propelled vehicle . . ." ARS 28-4001(3)(2009). [16] Clearly, the trailer is not self-propelled. Secondly, even if the trailer could be considered a motor vehicle, Arizona's financial responsibility requirements do not apply to a motor vehicle that is "subject to the requirements of a provision of

---

[16]    In this sense, the Arizona statute differs from the Tennessee statute. "Motor vehicle" is defined in the Tennessee Financial Responsibility Act as a "self-propelled vehicle that is designed for use upon the highway, including trailers and semitrailers designed for use with motor vehicles . . ." Tenn.Code Ann. § 55-12-102(6).

law requiring insurance or other security on certain types of vehicles." ARS § 28-4003(2)(2009). Thus, because of the federal financial responsibility requirements, Arizona's requirements would not apply to the trailer. Lastly, the Arizona public policy is met if a liability insurance policy with limits of $15,000.00 for bodily injury or death of any one person in any one accident, or, in the case of bodily injury or death of two or more persons, $30,000.00, is available. Here, the $1,000,000.00 in coverage provided by World Trucking far exceeds the applicable Arizona limits of coverage.

**C. Does the MCS-90 Endorsement Negate the Limitation or Exclusion of Endorsement CO-013?**

Although the parties have raised other issues, this really is the crucial question at the core of this litigation. If the MCS-90 negates the CO-013 endorsement, then the tort defendants are insureds under the U.S. Fire policy; if not, there is no coverage. Any consideration of the effect of the MCS-90 in the policy necessarily requires a review of the history and purposes of the MCS-90 endorsement.

### 1. The History and Purpose of the MCS-90

The Motor Carrier Act of 1980, 49 U.S.C. § 10101 *et seq*., and the regulations promulgated thereunder require certain interstate motor carriers to obtain an insurance policy containing "a special endorsement . . . providing that the insurer will pay within policy limits any judgment recovered against the insured motor carrier for liability resulting from the carrier's negligence, whether or not the vehicles involved in the accident is specifically described in the policy." *Illinois Central Rail- road Co. v. Dupont*, 326 F.3d 665, 666 (5th Cir. 2003). The legislation was, in part, intended to address abuses that had arisen in the industry which threatened public safety, including the use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce. *Empire Fire*

*& Marine. Ins. Co. v. Guaranty Nat'l. Ins. Co.*, 868 F.2d 357, 362 (10th Cir. 1989).

In response to the passage of the Motor Carrier Act, the Secretary of Transportation promulgated a motor carrier endorsement form known as the MCS-90. See 49 C.F.R. 387.15 (2009). The endorsement is to be attached to the truckers' liability policy issued to a motor carrier "for the purpose of providing notice to the general public that all criteria of section 30 [the financial security requirements] have been met." Minimum Levels of Financial Responsibility for Motor Carriers, 46 Fed. Reg. 30974, 30978 (June 11, 1981) (codified at 49 C.F.R. pt. 387). The required language of the form endorsement is set forth in the regulation.

"It is well-established that the primary purpose of the MCS-90 is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers." *John Deere*, 229 F.3d at 857; *see also* 49 C.F.R. § 387.1 ("The purpose of these regulations is . . . to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways.") In order to accomplish this purpose, the endorsement "makes the insurer liable to third parties for any liability resulting from the negligent use of any motor vehicle by the insured, even if the vehicle is not covered under the insurance policy." *T.H.E. Ins. Co. v. Larson Intermodal Services., Inc.*, 242 F.3d 667, 671 (5th Cir. 2001). The MCS-90 endorsement applies "regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." 49 C.F.R § 387.15.

The insurer is not without recourse when it is obligated to provide coverage under an MCS-90 endorsement. When the insurer is required to make a payment it would not have made but for operation of the endorsement, the insurer may recover such payments from the insured. 49 C.F.R. § 387.15, Illustration I ("The insured agrees to reimburse the company for any payment made by

24

the company... for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in [the MCS-90] endorsement.").

### 2. The Effect of the MCS-90 on the U.S. Fire Policy

The effect of the MCS-90 on the U.S. Fire policy presents a significant question about which the parties strenuously disagree. The precise issue does not appear to have been considered by the Sixth Circuit and both parties cite several state and federal court cases from other circuits which they believe support their view of the case. As noted above, the plaintiffs rely primarily on two state supreme court decisions and a duo of federal circuit court of appeals cases, while the defendants find support for their position in a California district court decision, affirmed by the Ninth Circuit, and several federal circuit court of appeals cases.

In *Adams v. Royal Indem*. Co., 99 F.3d 964 (10th Cir. 1996), the Tenth Circuit considered a factual scenario very similar to the one in this case. Adams was seriously injured in an accident involving a tractor-trailer and obtained a substantial state court judgment against the driver of the tractor-trailer.[17] Adams then sued Royal, the insurer of both the lessee of the trailer, who had in turn leased the trailer to the driver of the tractor-trailer involved in the accident, and the lessor of the trailer. The district court granted summary judgment in favor of Royal on grounds that the trailer was not a "covered auto" under the policy and the driver of the tractor-trailer was not an insured under either policy. The district court concluded that the MCS-90 applicable to both policies did not extend coverage to the driver because the driver could not be considered an insured.

The Tenth Circuit affirmed the district court's finding that the trailer was not a covered auto

---

[17]    Adams had obtained a default judgment against the driver of approximately $ 1 million but had been unsuccessful in collecting the judgment. Although the court's opinion does not explicitly say so, it is apparent that there was no insurance of any kind available to compensate Adams, except for the lessee's Royal policy.

under either policy. The Tenth Circuit also agreed with the district court that the MCS-90 did not extend coverage to the driver on the lessor's Royal policy. The circuit court, however, held that the MCS-90 modified the definition of insured under the lessee's Royal policy so that Royal was liable to Adams on the policy.

Both Royal policies defined an insured as including a permissive user, which the driver was, in language almost identical to the language of the U.S. Fire policy here. Also, as with the policy at issue here, "auto" was defined to include a trailer. Both policies had a schedule of covered autos; neither listed the trailer involved in the Adams accident and the policies explicitly provided that only listed autos for which a premium had been paid were covered autos. The lessee's policy, however, had a handwritten notation in the schedule of covered autos of "any trailer," while the lessor's policy had a typed notation of "any undescribed trailer while singularly attached." Both policies, as noted above, had the ICC mandated MCS-90 endorsement.

Adams argued that both basic policies provided coverage because the "omnibus clause" defined an insured as anyone "using with your permission a covered auto you own, hire or borrow." Both the district court and the Tenth Circuit disagreed because the policy schedule of covered autos applied only to "owned vehicles" and neither the lessee nor the lessor owned the trailer involved in the Adams accident. *Adams*, 99 F.3d at 967. The Tenth Circuit noted that both policies contained a separate schedule of covered autos hired or borrowed, which was blank. As a result, neither policy insured the trailer involved in the accident.

The Tenth Circuit framed the issue in *Adams* as "whether [the driver] can be considered an "insured" under either policy *after* the policy is modified by the [MCS-90] endorsement, thereby triggering an obligation for Royal to satisfy Adams' judgment against [the driver]." *Id.* at 969 (emphasis in original). In answering that question, the Tenth Circuit noted that Adams was "a

member of the general public, which is precisely the group that is intended to be protected by the [MCS-90] endorsement." *Id.* The Tenth Circuit explicitly disagreed with the district court finding that the definition of insured in the basic policy, which did not include the driver of the tractor-trailer because he was not using a covered auto, could not be expanded by the MCS-90, which did not include its own definition of insured. Thus, the Tenth Circuit held that the MCS-90 "endorsement precludes a policy from limiting the *definition of an insured* to one who owns, hires or borrows only specifically described motor vehicles because such a limited definition would subvert the purpose of the ICC endorsement of requiring coverage on *all* regulated vehicles regardless of whether or not they are listed in the policy specifically." *Id.* at 970 (emphasis in original). The MCS-90, according to the Tenth Circuit, "must be read to eliminate the limiting clause that coverage applies only to covered autos." *Id.* at 971.

Of particular interest was the Tenth Circuit's rejection of the district court's reliance on *Empire Indem. Ins. Co. v. Carolina Cas. Ins. Co.*, 838 F.2d 1428 (5th Cir. 1988), "for the proposition that the [MCS-90] does not modify a policy which defines the insured as a person driving a covered vehicle when the insured is not driving a covered vehicle." *Id.* at FN 9. The Tenth Circuit noted that *Empire* involved a dispute among several insurers about who ultimately was liable to pay a judgment rather than a claim by a member of the public who sought to invoke the MCS-90 to collect a judgment from an insurer. Thus, the Tenth Circuit made a distinction between cases where an injured member of the public seeks recovery because of the endorsement and cases where there are disputes among insurers over ultimate liability. *Id. (*citing *Industrial Indemnity Co. v. Truax Truck Line, Inc.*, 45 F.3d 986, 991 (5th Cir. 1995)).

The Tenth Circuit summarized its decision as follows:

> We consider our interpretation to be consistent with the purpose of

the endorsement. By deleting the policy requirement that an insured is defined in terms of described autos, the insurer assumes the role mandated by Congress and the ICC of protecting the public from interstate truckers who either themselves utilize, or give permission to others to utilize, uninsured vehicles which they own, hire, or borrow, but which are not listed in their insurance policies. This ICC endorsement is mandatory and any insurer who wishes to insure entities for public liability resulting from the operation, maintenance, or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 must do so knowing that there are government mandates restricting their ability to limit coverage, and they can presumably set their premiums accordingly. . .

*Id.* at 971-72. [18]

In *John Deere Ins. Co.v. Nueva*, 229 F.3d 853 (9th Cir. 2000), the Ninth Circuit considered the same question under similar facts. John Deere Insurance Company brought a declaratory judgment action seeking a declaration that it had no duty under a liability policy it had issued to indemnify permissive users of the insured's semitrailer involved in a traffic accident. In the underlying personal injury action, a tractor-trailer rear ended a bus operated by Nueva, resulting in personal injuries to Nueva. The driver and owner of the tractor were uninsured. The owner of the trailer was insured by John Deere. At the time of the accident, the owner had agreed to sell the trailer to the owner of the tractor but had not yet transferred title. The John Deere policy included the federally mandated MCS-90.

The insurance policy defined an insured as the named insured (the owner of the trailer) and anyone else using a "covered auto" with the insured's permission. Only those autos specifically scheduled in the policy were covered autos. The trailer was not listed in the schedule of covered

---

[18] The Tenth Circuit made it clear, therefore, that the MCS-90 operates to expand coverage beyond that provided in the basic policy, at least in situations where the insured under the policy is defined in terms of described autos.

autos; thus, the driver and owner of the tractor-trailer were permissive users of a non-covered vehicle and not insureds under the policy's express terms. The Ninth Circuit framed the question as "whether a federally mandated endorsement to an insurance policy creates a duty on the part of an insurer to indemnify a permissive user of an auto not covered by the underlying policy for injuries he negligently caused to members of the public." *Id.*, at 854.

Noting that the "purpose of the MCS-90 is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers," *Id.* at 857 (citing *Harco Nat. Ins. Co. v. Bobac Trucking, Inc.*, 107 F.3d 733 (9th Cir. 1997)), the court found that the appellants, injured members of the public, "are precisely the group meant to be protected by the MCS-90" and made a distinction between cases where injured members of the public seek indemnity under an MCS-90 and the case were two insureds or an insurer and its insured are seeking to determine their rights pursuant to the policy. *Id.* at 857.

John Deere took a position very similar to the one taken by the defendants in this case, *i.e.*, that the MCS-90 only negates the "covered auto" limitation with regard to the named insured. In rejecting John Deere's argument, the Ninth Circuit stated:

> The critical language in the endorsement is the provision which states that "the insurer agrees to pay... any final judgment recovered against the insured for public liability... *regardless of whether or not each motor vehicle is specifically described in the policy*[.]" (Emphasis added). This language indicates that whatever limitation a policy expresses regarding coverage extending only to "covered" or "specified" autos, this limitation ceases to operate when an injured member of the public seeks indemnification on behalf of the "insured". See *Empire*, 868 F.2d at 362 (The MCS-90 "negates any inconsistent limiting provisions in the insurance policy to which it is attached[.]"). Furthermore, a policy containing the MCS-90 "cannot explicitly limit liability to those vehicles specifically described therein, nor can it indirectly so limit coverage by attempting to define who is an insured in terms of specifically described vehicles." *Adams*, 99 F.3d at 970; *See also Canal* 889 F.2d at 610 (recognizing

that the MCS-90 reads excess and other-insurance clauses out of the policy as against injured members of the public.)

John Deere asks us to read the use of the word "insured" in the endorsement as referring only to its named "insured," Sahota. In other words, John Deere maintains that the MCS-90 only negates the "covered auto" limitation with regard to the named insured, and would not impact its obligations regarding permissive users. However, we decline to limit the endorsement in this manner. Under John Deere's proffered interpretation, the MCS-90 negates the express provision in part(a) of the "WHO IS AN INSURED" section of the policy which limits coverage to only "covered autos." This is so because without the endorsement, Sahota would not be an "insured" under the policy if he caused injury while driving a non-covered auto. It is the endorsement that would transform him into an "insured". Thus, it is inescapable that the effect of the MCS-90 endorsement is to modify the policy's definition of an "insured." ...

. . .the MCS-90 negates the limitation that only users of "covered autos" are "insureds". Therefore, we conclude that under the policy before us, John Deere cannot avoid indemnifying [the driver and operator/lessee] by relying on the policy's narrow definition of "insured" which attempts to limit that status to permissive users of solely "covered autos". See *Adams*, 99 F.3d at 970.

*Id*. at 859.

As noted above, plaintiffs' also rely on recent decisions of the highest state courts in Ohio and Virginia. In *Lynch v. Yob*, 95, 768 N.E.2d 1158 (Ohio 2002), the Ohio Supreme Court relied on the holdings in *Adams* and *John Deere* to resolve a question of whether a policy of liability insurance covering a leased trailer involved in an accident provided coverage to an injured party under an MCS-90 endorsement "even though the operator of the rig was not an insured under the terms of the trailer's main policy, and even though there is no claim that the trailer owner was negligent." *Id.* at 1159.

The facts in *Lynch* were very similar to those in the underlying tort actions. An accident involving a tractor-trailer and an automobile took the lives of the automobile's driver and a

passenger. The tractor-trailer was driven by an employee of the tractor's owner. The tractor was insured by AIG with a policy limit of $1 million. The trailer's owner was also insured by AIG with a policy limit of $2.5 million. Neither the tractor owner nor the driver were insureds under the AIG policy on the trailer. Thus, no coverage was available under the basic policy; however, the policy included an MCS-90 endorsement. The trial court held that the MCS-90 provided coverage up to the $2.5 million policy limit. The intermediate court of appeals reversed the judgment of the trial court and held that AIG had no obligation to indemnify the owner and driver of the tractor. More specifically, the court of appeals held that the MCS-90 was not triggered unless there was liability on the part of an insured under the basic AIG policy. The Ohio Supreme Court reversed the Ohio Court of Appeals.

Applying federal law to interpret the MCS-90 endorsement, the Ohio Supreme Court adopted the reasoning of the *Adams* and *John Deere* decisions to find coverage available under the trailer policy's MCS-90 endorsement. *Id.* On appeal, AIG argued that *Adams* and *John Deere* were "distinguishable from this case because those cases involved underlying policies that limited coverage to specifically described vehicles, while this case involves a fundamentally different underlying policy limitation, that "truckers" other than employees of the named insured are not covered while using the trailer." *Id.* at 1163. AIG further argued "that the MCS-90 endorsement operates to negate exclusions from coverage but cannot transform noninsured parties into insureds." *Id.* The Ohio Supreme Court rejected AIG's argument as too restrictive a reading of *John Deere* and *Adams* and held:

> . . . The case sub judice involves a permissive user of a noncovered vehicle, the leased trailer at issue, and so the rule of *John Deere Ins. Co. v. Nueva* and *Adams* is fully applicable. That rule that emerges from those cases is that the MCS-90 endorsement should be read to eliminate any limiting clauses in the underlying policy restricting the

31

scope of coverage. *See Adams*, 99 F.3d at 971; *John Deere Ins. Co. v. Nueva*, 229 F.3d at 859.

> We find that although there may be some factual differences between the case sub judice and the two federal appellate decisions (for example, that there is coverage available on the tractor in this case while there was not in *John Deere Ins. Co. v. Nueva* and *Adams*), the reasoning of those two cases fully applies to our determination.

*Id.* at 1163.

In *Heron v. Transportation Cas. Ins. Co.,* 650 S.E.2d 699 (Va. 2007), ER Transport Services, Inc. ("ER") was registered with the FMCSA as an interstate motor carrier and was insured by a liability insurance policy issued by Transportation Casualty Insurance Company ("TCI") which contained an MCS-90 endorsement. ER's employee, driving a tractor-trailer owned by ER, collided with an automobile operated by Craig K. Heron. As a result of the collision, Craig K. Heron and Alma P. Heron died, and their daughter suffered serious personal injuries.

TCI filed a declaratory judgment action seeking a court declaration that the policy issued by TCI provided no coverage for the accident and that TCI had no obligation to pay any judgment rendered against ER or its driver. Because the driver had a bad driving record, the TCI policy explicitly excluded him as a covered driver. The parties agreed that there was no coverage unless coverage was provided by the MCS-90 endorsement. TCI argued that the MCS-90 only applies to accidents which occur in the course of transportation in interstate commerce, and not the accident in question, which occurred exclusively in intrastate commerce.

The Virginia Supreme Court found coverage by applying simple, state law contract rules to the interpretation of the MCS-90, finding that the plain language of the MCS-90 provided that the insurer would pay any final judgment against the insured (ER) resulting from negligence in the operation or use of motor vehicles subject to the requirements of the Motor Carrier Act of 1980. The

parties had stipulated that ER was the owner of a vehicle that was subject to the financial responsibility requirements of the Motor Carrier Act, and was subject to a claim and potential judgment for damages resulting from negligence in the operation of that vehicle. On the stipulated facts, the Court rejected TCI's claims that the MCS-90 endorsement only applies to accidents that occur in the course of transportation in interstate commerce. It was, therefore, not necessary for the Supreme Court to consider the federal statute or regulations that motivated the parties to adopt the MCS-90.

As noted above, U.S. Fire and North River rely heavily on *Del Real v. United States Fire Ins. Crum & Forster*, 64 F.Supp.2d 958 (E.D. Cal. 1998), *aff'd* 188 F.3d 512, 1999 WL 626619 (9th Cir. 1999) (unpublished opinion). In *Del Real*, plaintiffs in an automobile accident case obtained a state court judgment against the owner of the tractor and driver of a tractor-trailer at fault in the subject accident. They then sued in federal court seeking to recover the unpaid portion[19] of the judgment against two insurance policies issued by U.S. Fire to the owner-lessor of the trailer involved in the accident. The insurance policies contained the federally mandated MCS-90 endorsement identical to the endorsement in the instant case. The U.S. Fire Policies excluded leased autos from coverage under the policy where other insurance coverage was available, as was the case there. Plaintiffs claimed that coverage was available because the tractor owner and driver were covered by the MCS-90 endorsement in the U.S. Fire policy.

The district court held that plaintiffs could not recover under the MCS-90 endorsement for two reasons. First, the driver and owner of the tractor were not "insureds" under the MCS-90 endorsement and the endorsement obligates the insurer only to pay "any final judgment recovered

---

[19]   The total amount of the damage award was $2,059,539. The trucking company's insurer paid its policy limits of $750,000.00, leaving an unpaid amount of $1,309,539.

against the insured." The district court found the policy ambiguous as to whether the term "insured" is limited to the named insured or also includes lessees or other permissive users. Because the language of the MCS-90 endorsement is mandated by federal regulation, the court held that the definition of "insured" found in the policy was not conclusive. *Id.* at 964.

The Court then concluded that the term "insured" in the endorsement was not intended to include lessees of the insured's equipment because it was illogical to conclude that the named insured agreed to reimburse the insurer for loss caused by its lessee (the insured agreed in the MCS-90 to reimburse the insurer for any payment made under the endorsement that the insurer would not have been obligated to make under the policy except for the endorsement), and it was equally illogical that the lessee had knowingly agreed to reimburse for payments made under the endorsement. Thus, reasoned the district court, reference to "insured" in the MCS-90 endorsement means the named insured. *Id.* The Ninth Circuit affirmed "for the reasons set forth" in the distict court's memorandum. *Del Real v. U.S. Fire*, 188 F.3d 512 (9th Cir. 1999).

XTRA, on the other hand, relies not only on *Del Real* but also on cases from the Third, Fifth, Eighth and District of Columbia Circuits for the proposition "that in order to secure insurance benefits pursuant to an MCS-90 endorsement (formerly an "ICC endorsement"), an injured party must first secure a judgment against the named insured in the insurance policy. See *National Mut. Ins. Co. v. Liberty Mut. Ins. Co.*, 196 F.2d 597 (D.C. Cir.), *cert. denied*, 344 U.S. 819 (1952); *Wellman v. Liberty Mut. Inc. Co.*, 496 F.2d 131 (8th Cir. 1974); *White v. Excaliber Ins. Co.*, 599 F.2d 50 (5th Cir.), *cert. denied,* 444 U.S. 965 (1979); and *Carolina Cas. Ins. Co. v. Ins. Co. of N. America*, 595 F.2d 128 (3d Cir. 1979).

*National Mutual v. Liberty Mutual* involved a dispute between two insurance companies. The victim of an automobile accident recovered judgment against Mench, the owner/driver of a

trailer truck. Mench was insured by National Mutual but the judgment was never satisfied. The victim brought suit in United States District Court against National Mutual. Under the terms of the National Mutual policy, National Mutual's liability did not begin until all other available insurance had been exhausted, *i.e.,* National Mutual's policy provided "excess" insurance. At the time of the accident, the trailer truck was under lease to Elliott Brothers Trucking Company and was being driven by Mench on Elliott's business. Elliott was insured by Liberty Mutual. National Mutual, believing itself not liable because the Liberty Mutual coverage was available to Mench, lodged a third party complaint against Liberty Mutual and Elliott. The district court dismissed the third party complaint.

The District of Columbia Circuit held that the third party complaint was not authorized by the Federal Rules of Civil Procedure because it rested on the theory that the third party defendants were liable to the victim of the accident, not to the third party plaintiff (National Mutual). The court also held that the third party complaint could not be read as claiming that Liberty Mutual and Elliott were liable to National Mutual on the basis of subrogation because "there is no basis for subrogation in the present case." *Id.* at 598. The court found that no subrogation right arose "simply because Mench was driving the vehicle on [Elliott's] business at the time" of the accident. Id. at 599. The court also examined the Liberty Mutual policy because "[t]here might be subrogation if Mench were covered as an insured" under the Liberty Mutual policy. *Id.* Mench, however, was not an insured under the Liberty Mutual policy because the owner of the vehicle was excluded from the definition of the term "insured." *Id.* The court also determined that the "ICC endorsement" [predecessor of the current federally mandated MCS-90] did not change that result. The court stated:

> The endorsement was required by the Interstate Commerce Act, 49 U.S.C.A. § 315, for the protection of members of the public; it doubtless would have enured to the benefit of [the auto accident

victim], had she chosen to sue Elliott Bros. But it hardly serves to shift Mench's liability from his own insurer to Elliott Bros.' insurer. Nor does it make Mench an 'insured' under the Liberty policy; that is still a matter governed by the express provisions of the body of the contract.

*Id.* at 600. (footnote omitted)

In *Wellman v. Liberty Mutual*, Roberta Wellman suffered serious personal injuries in an automobile collision with a truck driven by its owner, Mitchell. At the time of the accident, Mitchell was returning from delivering a load of cargo for Morgan, who had leased the tractor-trailer from Mitchell. On the return trip, Mitchell was hauling a load under contract with Illinois Machinery Transport, Inc. (IMT) without Morgan's knowledge or approval. Wellman sued Morgan, Mitchell and IMT in Missouri state court and obtained a substantial default judgment against Mitchell and IMT. She voluntarily dismissed her claim against Morgan. Wellman then sued Liberty Mutual, Morgan's liability insurance carrier in federal court in an effort to collect on the default judgment. *Wellman*, 496 F.2d at 132.

The district court held that the Liberty Mutual policies[20] afforded coverage to Mitchell and IMT and entered judgment for Wellman for the full amount of the default judgment. The Eighth Circuit reversed. The Eighth Circuit framed the issue as "whether the insurance policy covers owner-operator Mitchell and Broker-IMT." *Id.* The Liberty Mutual policy provided "Comprehensive Automobile Liability Insurance" to Morgan. The policy obligated Liberty Mutual to pay all sums the insured became legally obligated to pay because of bodily injury or property damage "caused by an occurrence and arising out of the ownership, maintenance or use . . . of any

---

[20] Liberty Mutual had issued two policies to Morgan-a primary liability policy and an umbrella policy. The policies were co-extensive as to coverage provisions.

automobile."[21] *Id.* at 135. "Persons Insured" under the policy included the named insured (Morgan) and any person using an owned or hired automobile with the permission of Morgan "provided . . . his actual use thereof is within the scope of such permission." *Id.* The policy explicitly provided that the owner of a hired automobile and any agent or employee of the owner were not insureds. *Id.*

Based upon these basic provisions of the policy, the court determined that "Mitchell was, as a matter of law, operating the vehicle within the scope of the insured's permission, and, under these circumstances, the 'Persons Insured' provision would cover him." *Id.* at 136. The court further determined that "[t]he exclusion . . . of 'the owner . . . of a hired automobile' would not bar coverage to an owner-operator since he would be protected . . . as a user whose 'actual operation . . . is within the scope of such permission.'" *Id.* The policy, however, also contained a "Truckmen-Form A" endorsement which modified the coverage to exclude from coverage as an insured "the owner or any lessee (of whom the named insured is a sub-lessee) of a hired automobile, or any employee of such owner or lessee . . . while the automobile is not being used exclusively in the business of the named insured and over a route the named insured is authorized to serve by federal or public authority. . ." *Id.* at 136-37. The endorsement further specifically provided that "a driver or other person furnished to the named insured with an automobile hired by the named insured shall be deemed not to be an employee of the named insured." *Id.* at 137. The policy apparently did not contain an MCS-90 endorsement.

Based on these policy provisions, the Eighth Circuit held:

> . . . Thus, an owner-operator, though he may be deemed a 'statutory' employee for liability purposes, is not classified as an employee of the insured for insurance purposes.

---

[21] "Automobile" was defined as "a land motor vehicle, trailer, or semi-trailer designed for travel on public roads." *Wellman*, 496 F.2d at 135, n.5.

> Here, Mitchell, as a non-employee under the policy, was operating
> and using the vehicle at the time of the accident on the business of
> IMT, a third party, not in the exclusive business of the named
> insured. As a result, the specific language of paragraphs (b)(1) and
> (d)(1) of 'Truckmen-Form A,' stipulating that the use of the hired
> automobile be 'exclusively in the business of the named insured,'
> requires that we construe the policy as affording no liability coverage
> to owner-operator, Mitchell, or to IMT.

*Id.*

The Eighth Circuit further held that ICC regulations which create a type of statutory

employment under which a franchised carrier becomes responsible for the negligence of the owner-

operator, at least when he is engaged in the activities of the carrier, see *Cox v. Bond Transportation,*

*Inc.*, 249 A, 2d 579, 589, *cert. denied* 395 U.S. 935 (1969), cannot be read into a policy to impose

liability upon an insured in contravention of the precise terms of the policy. *Wellman*, 496 F.2d at

37.[22]

*White v. Excalibur Ins. Co.*, 599 F.2d 50 (5th Cir. 1979) is another case dealing with the

liability of a lessee's insurer for acts of "statutory" employees. Superior Trucking Company

(Superior), a licensed interstate motor carrier, entered into a lease agreement with Crawford under

which Crawford agreed to supply Superior with trucks and drivers to be used in Superior's business.

The agreement purported to establish an employer-independent contractor relationship between

Superior and Crawford. Wright and Lindsey were working for Crawford as drivers, hauling

merchandise for Superior. While Lindsey was driving and Wright was asleep in the cab, their truck

---

[22]   The Eighth Circuit emphasized, however, that the insurance coverage problem raised in
*Wellman* would not arise where a plaintiff presses his suit against the ICC carrier whose permit numbers
are carried on the truck at the time of the accident. The court specifically noted that Morgan could have
been liable to Wellman in the original state court proceeding if Mitchell were proved negligent. Had
Wellman obtained a state court judgment against Morgan, the result in the case would have been different
for the insurance policy would clearly have covered Morgan as the "named insured" even though his
liability was vicarious and statutorily derived. *Wellman*, 496 F.2d at 139.

was involved in a collision.  Wright was killed.

Wright's mother brought a tort action against Lindsey and was awarded a judgment.  She then sued Excalibur Insurance Company, Superior's insurer, in an effort to collect the judgment. The district court held that Wright's mother could not recover from Excalibur because Wright was, by virtue of federal law, a statutory employee of Superior.  As such, Wright was not a beneficiary of the Excalibur policy issued in compliance with Georgia workmen's compensation laws and his mother's exclusive remedy against Superior was workmen's compensation.

The district court further held that Wright's mother could recover from Superior's insurer under federal law only if she first obtained a judgment against Superior.  The Fifth Circuit agreed, stating the issue in the case as "whether a driver, who during his rest period was killed by the tort of a fellow worker then actually operating the vehicle aboard which both were employed, may recover in tort from the carrier or whether his remedy is limited to [workmen's] compensation." *Id.* at 51.  Because Wright was a statutory employee of Superior by virtue of 49 U.S.C. § 304(e), the Fifth Circuit agreed that Wright's mother was barred by Georgia law from seeking a remedy apart from workmen's compensation.  The Fifth Circuit also rejected an argument by plaintiff that Superior was liable for her son's death as a matter of substantive federal law implicit in 49 U.S.C. § 304(e), *e.g.*, that federal law makes common carriers absolutely liable for all harm caused by operations in their leased vehicles.  The court held, in relevant part, that the financial responsibility requirements of federal law relating to leased vehicles could not be read into a carrier's insurance policy to hold an insurer liable to pay a judgment against a truck driver (but not against the motor carrier) for negligently causing the death of a fellow driver killed in an accident.  Relying on *Wellman*, the court ruled that under 49 U.S.C. § 315 (now section 13906), "in order for [the insurer] to be liable under the policy filed by [the motor carrier] with the ICC, [the  motor carrier] must first

39

be adjudicated liable as a party." *Id*. at 55.

Lastly, XTRA relies on *Carolina Casualty Ins. Co. v. Ins. Co. of North America*, 595 F.2d 128 (3d Cir.1979). The "pattern of facts" in the case, characterized by the Third Circuit as a "common one," is fairly simple. An ICC-certified motor carrier (Refrigerated Transport) leased a truck; the lessor of the vehicle (Stanford) provided the driver (Wicker). The truck, while carrying goods for Refrigerated Transport and displaying the ICC placards of Refrigerated Transport, was involved in an accident. Injured members of the public (the Babcocks) sued Refrigerated Transport, Stanford and Wicker for damages. Stanford's insurance carrier (Carolina Casualty) filed a separate declaratory judgment action against Refrigerated Transport's insurance carrier (INA) seeking a declaration as to which insurance company had primary responsibility for defending and paying any settlement or judgment in the underlying tort action. Both insurance companies contended that their respective liability policies applied only as excess insurance and that the other's policy was primary.

The Third Circuit characterized the case "as an action to determine where the ultimate financial responsibility for the injury rests" and not "a determination of the duty owed by a motor-carrier lessee and its insured to the injured public." *Id.* at 137-38 (citing *Allstate Ins. Co. v. Liberty Mutual Ins. Co.*, 368 F.2d 121, 125 (3d Cir. 1976)). The Court noted that "where the case is concerned with responsibility as between insurance carriers," and not with the federal policy of protecting the public, "I.C.C. considerations are not determinative" and "a court should consider the express terms of the parties' contracts." *Id.* at 138. Finding that neither federal motor carrier requirements nor the lease and insurance provisions pursuant thereto determinative of the respective duties of the insurers, the court turned to state law and the insurance contracts themselves to determine the allocation of financial responsibility. *Id.* The court concluded "that nothing in the federal motor carrier requirements, the trip lease, or the imputed ICC endorsement absolves Stanford

40

and Carolina Casualty of any duty they might otherwise have to pay judgments entered against Stanford," but remanded to the district court for further determination of the allocation issues between the two insurers. *Id.* at 144.

One additional case bears some mention. In *Pierre v. Providence Washington Insurance Co.*, 784 N.E.2d 52 N.Y.(2002), a divided Court of Appeals of New York considered a factual scenario much like the one in the instant case. Plaintiff Pierre was injured when his vehicle was struck by a tractor-trailer driven by Harris. Harris' employer owned the tractor and the trailer was owned by Blue Hen("Blue Hen"), a federally registered motor carrier engaged in the business of transporting goods in interstate commerce. Harris' employer had leased the trailer to Blue Hen and agreed to provide a driver. The lease agreement obligated Blue Hen to provide liability insurance. There was no dispute that the tractor-trailer was being operated at the time of the accident in the course of Blue Hen's business.

The plaintiff, Pierre, sued Harris and his employer (the driver and owner of the tractor) and obtained a default judgment. Pierre learned, during the course of the personal injury litigation, that Blue Hen owned the trailer and that Providence had issued a truckers' liability policy to Blue Hen for automobile accidents occurring during the course of Blue Hen's business. Attached to the policy was the federally mandated MCS-90. Pierre then sued Providence seeking to collect his judgment. Providence defended on the basis that neither Harris nor his employer had notified Providence of the accident as required by the policy. Providence argued that the MCS-90 was "triggered only if the injured party obtains a judgment against the named insured who purchased the policy, in this case Blue Hen." *Id.* at 57.

The Court of Appeals of New York described the regulatory and precedential background as follows:

The MCS-90 endorsement, a creature of federal regulation, must be interpreted according to federal law. Federal courts that have interpreted the endorsement in the context of claims brought by injured parties have consistently focused on the literal language of the endorsement and the underlying policy to determine its meaning (*see Integral Ins. Co. v. Lawrence Fulbright Trucking, Inc.*, 930 F.2d 258 [2d Cir. 1991]). Appellate courts have also consistently held that an insurance company may be obligated to compensate an injured party under an MCS-90 endorsement even if the motor carrier who purchased the underlying policy was not the negligent party responsible for causing the injuries (*id.; see also John Deere Ins. Co. v. Nueva*, 229 F.3d 853 [9th Cir. 2000], *cert. denied* 534 U.S. 1127, 122 S. Ct. 1063, 151 L.Ed.2d 967 [2000]; *Campbell v. Bartlett*, 975 F.2d 1569 [10th Cir. 1992]; *Lynch v. Yob*, 95 Ohio St.3d 441, 768 NE2d 1158, *cert. denied sub. nom. National Union Fire Ins.Co. of Pittsburgh v. Lynch*, 537 U.S. 1097, 123 S. Ct. 695, 154 L.Ed.2d 648 [2002]). In other words, the motor carrier who purchased the insurance–the so-called named insured" – need not have been negligent; all that is required is that the accident resulted from negligence and that a judgment was entered implicating the coverage provisions of the policy and endorsement.

*Id.*

The Court of Appeals relied heavily on *John Deere Ins. Co. v. Nueva, Adams v. Royal Indemnity Co. and Campbell v. Bartlett,* 975 F.2d 1569 (10th Cir. 1992), a case where the court determined that a negligent truck driver was an insured within the terms of an MCS-90 endorsement, interpreting the term "insured" using the definition in the underlying liability policy. Focusing on the coverage provisions of the liability policy to which the MCS-90 endorsement was attached, the Court of Appeals held Pierre was entitled to payment under the endorsement, "regardless of whether the responsible party happened to have been the named insured who purchased the policy." *Id.* at 59. The Court of Appeals held that such result was "the only result consistent with the public policy underpinnings of the endorsement: shifting the risk of loss in motor vehicle accidents involving tractor-trailers operated in interstate commerce by guaranteeing that an injured party will be compensated even if a condition in the liability policy would otherwise provide the insurance carrier

42

with a valid defense." *Id.*

The three dissenters in *Pierre* argued that the language of the MCS-90 could "only be understood in the statutory and regulatory context that created the form," not by reference to the provisions of the underlying insurance policy. *Id.* at 63. The dissenter's found it significant that the language of the MCS-90 is that of Congress and the Secretary of Transportation and was not chosen by Providence, but rather was imposed by the federal government. *Id.* The dissenters thus would have interpreted the MCS-90 to require the insurance company to only pay a judgment against the named insured–the registered motor carrier.

As set forth above, the basic U.S. Fire policy at issue in this case provides no coverage to World Trucking for the March 27 accident unless the MCS-90 requires such coverage. While the case law on the matter is far from clear and somewhat conflicting, there appear to be two basic approaches to the interpretation of the MCS-90. Depending upon which approach is used in this case, the outcome may be different.

One approach, with some variations in the case law, is to interpret the MCS-90 endorsement as any other policy endorsement and determine its meaning in the context of other policy provisions, applying the usual rules for interpretation of insurance contracts. This is clearly the approach used by the *Heron*, *Pierre* and *Campbell* courts. The other approach is to interpret the MCS-90 only in the context of the regulatory and statutory framework which mandates its existence. This is the approach followed by the dissenters in the *Pierre* case and, at least nominally, by the Ninth and Tenth Circuits in *John Deere* and *Adams*.

There seems to be little doubt that it is federal law, which governs the interpretation of the MCS-90 in this case. The endorsement is required by federal law, and its language is prescribed by a federal regulation. It is a well settled principle that "the meaning of words in a federal statute

43

is a question of federal law." *Western Airlines, Inc. v. Board of Equalization of State of South Dakota*, 480 U.S. 123 (1987). Thus, virtually all jurisdictions to consider the question have concluded that the interpretation of the MCS-90 is a matter of federal law. *See, e.g., John Deere*, 229 F.3d at 856 ("Federal law applies to the operation and effect of ICC-mandated endorsements.") (citing *Planet Ins. Co. v. Transport Indem. Co.*, 823 F.2d 285, 288 (9th Cir. 1987); *Canal Ins. Co. v. First General Ins. Co.*, 889 F.2d 604, 610 (5th Cir. 1989), *modified on other grounds*, 901 F.2d 45 (5th Cir. 1990); *Ford Motor Company v. Transport Idem. Co.*, 795 F.2d 538, 545 (6th Cir. 1986) and *In re Yale Express Sys., Inc.*, 362 F.2d 111, 114 (2d Cir. 1966)).

One other principle is important as a threshold matter to the interpretation of the MCS-90 in this case. As noted above, the MCS-90 is a creature of federal law and its language is mandated by federal regulation. As such, the regulation has the force of law. The analysis of any regulation begins with the plain meaning of the regulation's language. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989); *United States v. Turkette*, 452 U.S. 576 (1981). The language of a regulation must necessarily be interpreted in the context of its statutory origin. If the language, in its statutory context, is clear and unambiguous, it must then be applied in accordance with its plain meaning. *See Smith v. United States*, 508 U.S. 223 (1993); *Kaiser Aluminum v. Bonjorno*, 494 U.S. 827 (1990); *Rubin v. United States*, 449 U.S. 424 (1981). Even where the language is ambiguous, case law sets forth settled rules of construction and interpretation, including an analysis of the underlying statute's structure and purpose. *See United States v. Jackson*, 759 F.2d 342, 344 (4th Cir. 1985). Additionally, the Sixth Circuit has addressed the issue of the weight to be given to an administrative agency's interpretation of its own regulations.

> An administrative agency's interpretation of its own regulations is entitled to substantial deference. *Udall v. Tallman*, 380 U.S. 1, 16,

44

> 85 S. Ct. 792, 13 L.Ed.2d 616 (1965). We defer to an administrative
> agency's interpretation of its own rule or regulation unless it is
> plainly erroneous or inconsistent with the regulation. *Bowles v.*
> *Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S. Ct. 1215, 89
> L.Ed. 1700 (1945); *Arctic Express, Inc. v. United States Dep't of*
> *Transp.*, 194 F.3d 767, 771 (6th Cir. 1999).

*A.D. Transport Express, Inc. v. United States*, 290 F.3d 761, 766 (6th Cir. 2002).

In light of the above stated rules, the obvious beginning point for this Court's analysis and

interpretation of the MCS-90 attached to the U.S. Fire policy is the statutory and regulatory

provisions which provide its context. The Secretary of Transportation has regulatory authority over

transportation by motor carriers in interstate commerce. 49 U.S.C. § 13501. A commercial motor

carrier may operate only if registered to do so and must be "willing and able to comply with . . . the

minimum financial responsibility requirements established by the Secretary pursuant to section[]

13906 . . ." 49 U.S.C. §§ 13901, 13902(a)(1)(D).

Section 13906 of Title 49, United States Code, requires a registered motor carrier to file

"with the Secretary a bond, insurance policy, or other type of security approved by the Secretary"

which is "sufficient to pay, not more than the amount of the security, for each final judgment against

the registrant for bodily injury to, or death of, an individual resulting from the negligent operation,

maintenance, or use of motor vehicles. . ." 49 U.S.C. § 13906(a)(1). The minimum level of financial

responsibility for a motor carrier transporting property must be "at least $750,000.00." 49 U.S.C.

§ 31139.

The implementing regulations are found in Part 387, Subpart A of the Code of Federal

Regulations. Subpart A "prescribes the minimum levels of financial responsibility required to be

maintained by motor carriers of property operating motor vehicles in interstate, foreign, or intrastate

commerce," 49 C.F.R. § 387.1, and "applies to for-hire motor carriers operating motor vehicles

transporting property in interstate or foreign commerce." 49 C.F.R. § 387.3. The regulations require

proof of the required financial responsibility by one of three methods.

> . . . The proof shall consist of -
>
> (1) "Endorsement(s) for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980" (Form MCS-90) issued by an insurer(s);
>
> (2) A "Motor Carrier Surety Bond for Public Liability under Section 30 of the Motor Carrier Act of 1980" (Form MCS-82) issued by a surety; or
>
> (3) A written decision, order, or authorization of the Federal Motor Carrier Safety Administration authorizing a motor carrier to self-insure under § 387.309, provided the motor carrier maintains a satisfactory safety rating as determined by the Federal Motor Carrier Safety Administration . . . .

49 C.F.R. § 387.7(d)(1)-(3). Thus, a motor carrier can establish proof of financial responsibility by

the MCS-90, a surety bond or by self insurance.

Certain forms are prescribed by the regulations for the purpose of showing compliance with

these financial responsibility requirements. Of relevance to this case is the form MCS-90 set forth

in 49 C.F.R. § 387.15. That section provides that the endorsement used to establish proof of

financial responsibility pursuant to 49 C.F.R. § 387.7(d)(1) <u>must</u> be in the form prescribed by the

regulation and further requires that "[t]he endorsement . . . shall be issued in the exact name of the

motor carrier." *Id.* The MCS-90 form prescribed by section 387.15 contains the following

provisions which have relevance to this case.

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration.

> In consideration of the premiums stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. . . . It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. . . .

49 C.F.R. § 387.15 (Illustration I).

Notably, the MCS-90 itself contains definitions for certain words used in the endorsement. These definitions include "accident," "motor vehicle," "bodily injury," "environmental restoration," "property damage," and "public liability." *Id.* Those same definitions appear in 49 C.F.R. § 387.5, which also includes various other definitions including that of "insured and principal," which is defined to mean "the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." 49 C.F.R. § 387.5. Section 387.5 specifically provides that its definitions apply to all of Subpart A, which includes 49 C.F.R. § 387.15, which contains the required language of the MCS-90.

While stated in various ways, there is almost universal agreement that the purpose of the MCS-90 is to protect the public. *See Empire Fire and Marine Insurance Company v. Guaranty National Insurance Company*, 868 F.2d 357, 362-63 (10th Cir. 1989) ("[T]he ICC endorsement [the predecessor of the MCS-90] . . . had its origin in the ICC's desire that the public be adequately protected when a licensed carrier uses a leased vehicle to transport goods pursuant to an ICC

47

certificate."); *Adams*, 99 F.3d at 968 ("[T]he policy behind this ICC endorsement was to protect the public from uninsured regulated vehicles.  . . . This ICC endorsement is designed to require ICC-certified carriers to insure against public liability for all their motor vehicles that are subject to the financial responsibility requirements of the Motor Carrier Act.  By requiring all such described insurance policies to contain this ICC endorsement, the ICC prevents the possibility of that, through inadvertence or otherwise, some vehicles may be left off a policy to the detriment of the public."); *Canal Ins. Co. v. First General Ins. Co.*, 889 F.2d 604, 611 (5th Cir. 1989) (noting that the "policy embodied in the statutes and regulations was to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers."), *mandate recalled and reformed*, 901 F.2d 45 (5th Cir. 1990); *Travelers Ins. Co. v. Transport Ins.* Co., 787 F.2d 1133, 1140 (7th Cir. 1986) (stating the purpose of the ICC regulations "is to insure that an ICC carrier has independent financial responsibility to pay for losses sustained by the general public arising out of its trucking operations."); *John Deere*, 229 F.3d at 857 ("It is well established that the primary purpose of the MCS-90 is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers."); *Kline v. Gulf Ins. Co.*, 466 F.3d 450, 456 (6th Cir. 2006) ("The federal government balanced the need to compensate victims with the needs of industry and determined the appropriate minimum compensation for members of the public.").

The MCS-90 endorsement attached to the U.S. Fire policy requires U.S. Fire, in language directly from 49 C.F.R. § 387.15,  "to pay, within the limits of liability described herein, *any final judgment recovered against the insured* for public liability resulting from negligence in the operation, maintenance or use of motor vehicles" subject to the requirements of the Motor Carrier Act of 1980.  If "the insured" refers to World Trucking, then U.S. Fire is obligated to pay, up to its policy limits,  any judgment obtained by the underlying tort plaintiffs against World Trucking.  On

48

the other hand, if "the insured" refers only to the named insureds under the policy, as U.S. Fire maintains, then U.S. Fire has no obligation to indemnify the underlying tort plaintiffs for any judgment obtained against World Trucking. That much is relatively clear. It is not so clear, however, who "the insured" is under the terms of the MCS-90.

As noted by several courts, the MCS-90 itself does not contain a definition of "the insured." Title 49 C.F.R., Part 387, Subpart A, however, does include a definition of "the insured." Likewise, the basic U.S. Fire policy also contains a definition of "the insured." Thus, the Court is faced with its dilemma. Does the Court interpret the MCS-90 to determine the meaning of "the insured" by reading the MCS-90 in conjunction with the basic U.S. Fire policy? Or, does the Court interpret the meaning of "the insured" in the context of the statutory and regulatory framework and by reference to the definitions contained in the regulations? Based upon a review of the case law above, it appears that the highest state courts of Virginia and New York as well as the Tenth Circuit in *Campbell* have applied the former approach and all would likely hold that World Trucking is an insured within the meaning of the MCS-90. On the other hand, the Ninth and Tenth Circuits in *John Deere* and *Adams* purport to have interpreted the MCS-90 in the context of the federal statutes and regulations and these courts, too, would likely find World Trucking to be an insured under the MCS-90.

To this Court, at least, it appears that the MCS-90 can only be interpreted in the context of the statutory and regulatory provisions from which it has emerged. For the reasons which follow, this Court concludes that the only sensible reading and interpretation of the MCS-90 is that "the insured" is the named insured, *i.e.*, "the motor carrier named in the policy of insurance" and the MCS-90 attached to the U.S. Fire policy obligates U.S. Fire to pay a judgment against XTRA or other named insureds, but not against World Trucking, which is not a named insured under the

policy. In fact, it appears to the Court that 49 C.F.R. § 387.5's definition of "insured," which applies by its clear terms to all of Subpart A, including § 387.15, requires this result. In reaching this conclusion, this Court is mindful that two federal circuit courts of appeal appear to have come to a contrary conclusion. It also appears to this Court, however, that the Ninth and Tenth Circuits in *John Deere* and *Adams* may have reached the wrong conclusion when the MCS-90 is viewed in the context of the statutory and regulatory provisions.

As an initial matter, the language of the statute itself supports the interpretation that "the insured" in the MCS-90 refers to the motor carrier named in the policy of insurance. The statute requires that the insurance "be sufficient to pay, . . . *for each final judgment against the registrant* for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance or use of motor vehicles, . . ." 49 U.S.C. § 13906(a)(1) (emphasis added). The italicized language of the statute clearly suggests that the purpose of the MCS-90 is to assure payment of a final judgment against the registered motor carrier, which in this case is XTRA, not World Trucking. Consistent with the statute, the regulation also provides that no common carrier may engage in interstate commerce, and no permit be issued, until the MCS-90 has been acquired "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles . . ." 49 C.F.R. § 387.301(a). The same language is then carried forward to the MCS-90 which provides that the insurer "agrees to pay, within the limits of liability described herein, any final judgment recovered *against the insured* for public liability resulting from negligence in the operation, maintenance or use of motor vehicles . . ." In the context of these statutory and regulatory provisions, this Court concludes that "the insured" as used in the MCS-90 can only mean the motor carrier named in the policy of insurance.

50

Further support for this Court's interpretation of the MCS–90 is found in the body of the MCS-90 itself. The term "the insured"[23] is used at various other places in the body of the MCS-90 and, read together, these clearly illustrate that "the insured" means the motor carrier named in the policy. For instance, the MCS-90 also provides that "[t]he insured agrees to reimburse the company for any payment made by the company on account of any accident, claim or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement." The Armstrong plaintiffs seem to acknowledge that this provision would require XTRA, the named insured, rather than World Trucking, to reimburse U.S. Fire for any payment made to the tort plaintiffs as a result of the MCS-90. Yet, if World Trucking is "the insured" referred to in the language quoted above, and if "the insured" is defined consistently throughout the MCS-90, it would seem that it would be World Trucking which "agrees" to repay U.S. Fire. Because World Trucking is not a party to the U.S. Fire insurance contract, it can hardly be argued that World Trucking has "agreed to reimburse the company." One other example illustrates the illogical nature of the tort plaintiffs' argument. The MCS-90 also provides that the endorsement may be cancelled "by the company or the insured." It cannot even be reasonably argued that the reference to cancellation by "the insured" refers to anyone other than a named insured under the policy. Only a party to the insurance contract could effect cancellation, and it would be nonsensical to suggest that World Trucking would have any right to cancel the U.S. Fire policy.

While it is true that the purpose of the MCS-90 is to protect the public, interpreting the MCS-90 in the manner done by the Ninth and Tenth Circuits and advocated by the plaintiffs in this case

---

[23]    The MCS-90 refers to "the insured," not "an insured," further suggesting the "the insured" means the named insured.

goes far beyond anything that Congress intended by the enactment of the Motor Carrier Act. In this Court's view, the financial responsibility requirements of the law were not intended by the Congress to create strict liability on the part of an insurance company to compensate any injured member of the public but rather to assure payment of at least the minimum level of financial responsibility to members of the public injured in an accident on account of negligence by a motor carrier. That is especially true where, as here, the congressional intent of providing injured members of the public at least the minimum level of financial compensation has been met because of the liability insurance carried by World Trucking. As the Sixth Circuit noted, the "purpose of the [MCS-90] endorsement is to give security for the protection of the public *up to the limits prescribed*." *Kline*, 466 F.3d at 455 (citing 46 Fed. Reg. 30974) (emphasis in original). Further, the Sixth Circuit noted that "public policy considerations do not warrant additional compensation," in circumstances such as here where the injured members of the public have available to them compensation in excess of the minimum federal requirement.[24] *Id.* Likewise, interpreting the MCS-90 as the tort plaintiffs suggest in this case "raises other policy concerns. The federal government balanced the need to compensate victims with the needs of industry and determined the appropriate minimum compensation for members of the public." *Id.* at 456. Thus, to interpret the MCS-90 to afford coverage to the tort plaintiffs in this case distorts the congressional policy of requiring motor carriers to provide security for the protection of the public up to the limits prescribed by statute. Thus, this Court reluctantly concludes, to the extent they reach a contrary conclusion, that *John Deere* and *Adams* were wrongly

---

[24] As noted, *supra*, the tort plaintiffs have a total of $1.4 million of insurance coverage available to them. And, while that amount is clearly insufficient to adequately and completely compensate the tort plaintiffs for their horrible losses in this case, the amount nevertheless exceeds the minimum federal requirement.

decided and their holdings find no support under the plain language of the statute and regulations.[25]

One additional factor influences this Court's decision. On October 5, 2005, the FMSCA issued "regulatory guidance" setting forth the interpretation of the Department of Transportation with respect to the meaning of the term "the insured" in the MCS-90 form. See Regulatory Guidance for Forms Used to Establish Minimum Levels of Financial Responsibility of Motor Carriers (Regulatory Guidance), 70 Fed. Reg. 58065-01, (October 5, 2005). The Secretary of Transportation has delegated authority to the administrator of FMCSA to issue implementing regulations relating to financial responsibility requirements for motor carriers. 49 C.F.R. 1.73(f). FMCSA received a petition for rulemaking from several insurance companies and the American Insurance Association to amend and to clarify form MCS-90. The petitioners contended that changes were necessary in light of several federal and state court decisions, including *John Deere, Lynch* and *Pierre* which, they claimed, had misconstrued the form MCS-90. The primary change suggested by the petitioners was that the agency clarify that the word "insured" in the form MCS-90 means the "named insured." FMCSA denied the petition for rulemaking on the basis that the petitioners' concerns could be adequately addressed through formal agency guidance to be published in the Federal Register. Regulatory Guidance, 70 Fed. Reg. at 58065-58066. The FMCSA provides interpretive guidance through a question and answer format. The regulatory guidance reads as follows:

---

[25]   This Court's conclusion is buttressed by the way Congress has regulated the use of non-owned equipment used by motor carriers to ensure that the motor carrier is fully responsible for the vehicle's operation. *See* 49 U.S.C. §§ 10927, 11107. Under current law, the lessee of a leased trailer is required to "assume complete responsibility for the operation of the equipment for the duration of the lease," 49 C.F.R. § 1057.12(c)(1), and to maintain liability insurance on the equipment. Consistent with the current state of the law, XTRA's lease agreement with World Trucking requires World Trucking to maintain $ 1 million in liability insurance coverage. See *Transamerica Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.*, 423 U.S. 28 (1975); *Prestige Casualty v. Michigan Mutual*, 99 F.3d 1340, 1343 (6th Cir. 1996).

Sections Interpreted

*Section 387.15 Forms*

Question: Does the term "insured," as used on Form MCS-90, Endorsement for Motor Carrier Policies of Insurance for Public Liability, or "Principal", as used in Form MCS-82, Motor Carrier Liability Surety Bond, mean the motor carrier named in the endorsement or surety bond?

Guidance: Yes. Under 49 CFR 387.5, "insured and principal" is defined as "the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." Form MCS-90 and Form MCS-82 are not intended, and do not purport, to require a motor carrier's insurer or surety to satisfy a judgment against any party other than the carrier named in the endorsement or surety bond or its fiduciary.

*Id.*

As set forth above, an administrative agency's interpretation of its own regulations is entitled to substantial deference, and this Court will defer to the agency interpretation unless it is plainly erroneous or inconsistent with the regulation. *See A.D. Transport Express*, 290 F.3d at 766. As noted by the Sixth Circuit in *A.D. Transport*, the Administrative Procedure Act, 5 U.S.C. § 553(b), specifically anticipates that an agency may issue interpretive rules and general statements of policy. As the Sixth Circuit noted:

An interpretive rule is a rule that clarifies or explains an existing law or regulation. *Your Home Visiting Nurse Servs., Inc. v. Sec. of Health & Human Servs.*, 132 F.3d 1135, 1139 (6th Cir. 1997). A rule is interpretive if it "merely explains 'what the more general terms of the act and regulations already provide.'" *Id.* (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983)).

*Id* at 768. Thus, FMCSA's interpretation of the MCS-90, the language of which is mandated by the federal regulation, is entitled to deference. The agency's interpretation of the regulation is neither plainly erroneous nor inconsistent with the regulation and is entirely consistent with this Court's own reading of the regulation. This Court also notes that the FMSCA's regulatory guidance was

54

not available when *Adams* and *John Deere* were decided.

## VII.    CONCLUSION

For the reasons set forth above, the motion for judgment as a matter of law filed by North River, [Doc. 183], the motion for judgment as a matter of law filed by U.S. Fire, [Doc. 185], and the motion for summary judgment filed by XTRA, [Doc. 84] will be GRANTED and the motions for summary judgment filed by Carlson, [Doc. 181], the Harmon plaintiffs, [Doc. 179], and the Armstrong plaintiffs, [Doc. 177], will be DENIED.   U. S. Fire, North River and XTRA are, therefore, entitled to a declaration that (1) World Trucking, Inc. and World Trucking Express, Inc., Nasko Nasov and Marjan Milev are not insureds under U.S. Fire Policy No. 1380265299 or North River Policy No. 553-085033-4, and (2) that World Trucking, Inc. and World Trucking Express, Inc. and their employees  are not entitled to defense, indemnity or coverage for the claims asserted against them in Civil Action Nos. 2:05-CV-44, 2:05-CV-62 and 2:05-CV-65 currently pending in the United States District Court for the Eastern District of Tennessee.

A separate judgment will enter.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
